**Application of Morris D. WILDING.**

**Patent Appeal No. 76–544.**

United States Court of Customs and Patent Appeals.

June 3, 1976.

pressure under conditions causing the dough to expand by the flashing of moisture therefrom, and causing sufficient denaturation to occur prior to said heated dough reaching said area so as to cause the product to retain an elongated cellular structure created by said flashing of moisture upon reaching said area.

Charles E. Bouton, Chicago, Ill., atty. of record, for appellant.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents; Henry W. Tarring, II, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

LANE, Judge.

This is an appeal from the decision of the Patent and Trademark Office Board of Appeals (board) affirming the rejection of claims 1, 2, 5, 6, 8–15, 19, and 23–25 in application serial number 642,208, filed May 29, 1967, entitled "Soybean Granules." We reverse.

### The Invention

Appellant's invention is a method for producing a protein food product having an expanded, elongated cellular structure similar to that of lean meat. Claim 1 adequately describes the method.

1. A method for preparing an improved protein food product comprising: forming a dough containing from about 15% to about 45% by weight, of water and defatted, undenatured, solvent-extracted oil seed protein material; heating said dough for a period of time less than about 5 minutes under pressure to a temperature of about 260 ° F. to about 380 ° F., sufficient to rapidly denature the protein of said dough, said dough having sufficient plasticity to be extruded in a self-binding form; and extruding said heated dough into an area of reduced

### Background

Appellant's application is a continuation-in-part of parent application serial number 436,358, filed March 1, 1965, which was involved in Interference No. 96,355 with Flier application serial number 600,471, filed December 9, 1966, and Atkinson application serial number 587,939, filed August 17, 1966. The count in issue in that interference read as follows:

The process of preparing an expanded food product which comprises mechanically working a protein mix of a solvent-extracted oil seed proteinaceous material having protein concentrations of at least 30 per cent and water in a concentration of 15 to 60 per cent, at a temperature above 200 ° F. and under elevated pressure sufficient to convert said mix into a flowable substance, and extruding said flowable substance through an orifice into a medium of lower pressure.

Appellant was junior party in the interference by virtue of the fact that each of the other parties was accorded the benefit of an earlier filed application.[1] The Board of Patent Interferences awarded priority of invention of the subject matter involved to Flier. During the motion period in that interference appellant moved to dissolve the interference with respect to the count in issue and to add as an interference count the following:

The process of preparing an expanded food product which comprises mechanically working a protein mix of a solvent-extracted oil seed proteinaceous material having protein concentrations of at least 30 percent and water in a concentration of at least 15 but not in excess of 60

---

1. Flier was accorded the benefit of application serial number 381,853, filed July 10, 1964. Atkinson was accorded the benefit of application serial number 369,189, filed May 21, 1964.

percent, at a temperature above 200 ° F. and under elevated pressure sufficient to convert said mix into a flowable substance, and extruding said flowable substance through an orifice into a medium of lower pressure, in a manner to vaporize the moisture and expand the mixture to provide an expanded elongated fibrous cellular structure.

Appellant's motion was denied.

### The Rejections

The examiner rejected all claims here on appeal under 35 U.S.C. § 103 as unpatentable over the count of the interference "and the entire disclosure of Flier." [2]

### The Board

The board noted the extensive differences between the claims on appeal and the lost count and concluded that the claimed method is neither anticipated by, nor obvious in view of, the process recited in the count. It therefore refused to sustain the rejection to the extent that it was based only on the interference count. [3] The board did, however, recognize that under some circumstances portions of the disclosure of a winning party to an interference could be used as a basis for rejecting claims in the application of the losing party. The board then noted disclosures which were common to both appellant and Flier regarding materials used and process conditions employed. In particular the board noted the use of identical or overlapping ranges in the respective applications for the oil content, moisture content, pH value, and protein content of the soybean meal, and for the

temperatures and pressures employed in the process. The board also found that the descriptions of the end products were the same in both applications.

In reviewing the two disclosures, however, the board noted some distinctions:

The most notable distinction between the Flier disclosure and that of appellant is the absence of any description [in Flier] of the starting soybean meal as being undenatured, and that a denaturing occurs in the extruder prior to the extrusion of the material into the reduced pressure area (the ambient atmosphere). However, we do not believe that there is any substantive distinction between the process of Flier and that of the appellant. Nowhere in the body of the Flier application is there any indication that the soybean starting material has received any treatment other than grinding and a solvent extraction of the oil. Denaturing requires a chemical-physical treatment of the soybean in order to achieve denaturing. No such treatment is described, and the soybean meal is not disclosed as having undergone such a treatment. There is therefore no reasonable basis from the Flier disclosure for presuming that the soybean meal is not undenatured.

\* \* \* \* \* \*

In our view, a fair reading of the Flier application, as noted above, leads to the conclusion that undenatured soybean meal is employed as the material in the process there described. We are also of the view that the treatment which the

2. The examiner apparently did not appreciate the fact that he could not reject appellant's claims under 35 U.S.C. § 103 on the entire disclosure of Flier since the sole basis for using the disclosure of a winning party to an interference to reject the losing party's claims is interference estoppel. The disclosure cannot be used as "prior art" in a rejection under 35 U.S.C. § 102 or 103. Of course the lost count alone is available as prior art under section 102(g) and thus 103 to the extent that it represents the prior invention of another in this country. See In re McKellin, 529 F.2d 1324, 188 USPQ 428 (Cust. & Pat.App.1976). It also should be noted that even under the doctrine of

interference estoppel the entire disclosure of Flier could not be used as a basis for a rejection of appellant's claims, but only that portion of Flier's disclosure corresponding to the subject matter claimed which is clearly common to both appellant's and Flier's application. See In re Risse, 378 F.2d 948, 54 CCPA 1495, 154 USPQ 1 (1967) for a complete discussion of this issue.

3. The board, in effect, found a patentable distinction between the claims on appeal and the count lost in the interference. See In re Cole, 82 F.2d 405, 409, 23 CCPA 1057, 1063, 29 USPQ 137, 141 (1936).

soybean meal is subjected to in the Flier extruder under the conditions disclosed would necessarily result in a denaturing of the soybean meal prior to extrusion. The board then concluded:

> In view of the above discussion, we find that the claims on appeal read directly on the subject matter which is common to both the appellant's applications and the Flier application, and under such circumstances, the Examiner here properly rejected the claims as unpatentable over the Flier application. The appellant's motion during the interference proposed a count which differs from the present claim in substantially the same manner as did the original count. The appellant therefore cannot be considered to be in the position of a party who attempted to put into issue during the interference the subject matter now claimed, but was refused. The subject matter which is now claimed and common with that of Flier was never attempted to be put into the interference by the appellant.

## OPINION

The first order of business is to note the confusion surrounding the rejection before us. Although the board stated that it reversed the examiner's rejection to the extent that it was based on using the count alone as "prior art" under section 103 (via 102(g)), it failed to clearly indicate whether or not it affirmed the examiner's section 103 rejection based on the entire disclosure of the Flier application. The board addressed itself to the subject matter which is commonly disclosed in appellant's application and that of Flier, implying to us that the board realized that the only possible rejection of appellant's claims on this record would have to be based on interference estoppel, a ground of rejection not specifically delineated by the examiner. However, the concluding paragraph of the board opinion states:

> Accordingly, *for the reasons given by the Examiner,* particularly those emphasized above, the Examiner's decision is affirmed. [Our emphasis.]

After this opinion appellant petitioned for reconsideration, alleging, inter alia, that the board advanced a new ground of rejection in its opinion. In a second opinion the board responded to this allegation:

> Contrary to the appellant's assertions, we did not advance any new grounds of rejection. We at most merely gave a slightly more expanded discussion than did the Examiner, but no new rejection was made by us.

The brief of the solicitor never once argues the propriety of the examiner's rejection under section 103. Rather, the entire brief concentrates on the propriety of the rejection of appellant's claims based on interference estoppel.

Because we find that no matter which ground of rejection is before us, the board must be reversed, we will not speculate about what the board did or did not do in its opinion regarding the examiner's original rejection.[4]

Since our decision in *In re Risse,* 378 F.2d 948, 54 CCPA 1495, 154 USPQ 1 (1967), the law has been settled that a rejection of a losing party's claims under 35 U.S.C. § 103 using the entire disclosure of the winning party is improper. We repeat what we said in *Risse* :

> We see no reasonable basis for a contention that an award or concession of priority necessarily makes the *complete* disclosure of the winning party's application available as prior art, either by itself or in combination with other art, against the losing party's application. [Id. at 954, at 54 CCPA 1503, 154 USPQ at 6 (emphasis in original).]

We noted in that opinion the confusion which had been prevalent between the concept of interference estoppel and prior art under sections 102 and 103 and stated:

---

4. This is not to say that we condone the actions of the PTO in not making clear to appellant the grounds for rejecting his claims.

The distinction which should be borne in mind is that, with regard to interference estoppel, the losing party is only estopped to obtain claims which read directly on disclosures of subject matter clearly common to both the winning party's application and that of the losing party; but that, with regard to prior art (including prior invention), the losing party cannot obtain claims to subject matter which is *either barred* under 35 U.S.C. § 102(g), or rendered *obvious* under 35 U.S.C. § 103, by the invention defined in the interference counts. [Id. at 957, 54 CCPA at 1506, 154 USPQ at 8 (emphasis in original).]

Therefore, is to the extent the board may have affirmed the examiner's rejection of appellant's claims under 35 U.S.C. § 103, using the entire Flier disclosure, that decision must be reversed.

 As noted above, we did recognize in *Risse* that under appropriate circumstances portions of a winning party's disclosure may be used as a basis for rejecting a losing party's claims under a theory of interference estoppel. However, for the doctrine of interference estoppel to apply, the PTO must show that appellant's claims read on disclosures which are clearly common to both the winning party's application and that of the losing party. Since the rationale for the doctrine of interference estoppel is that priority with respect to the claimed invention could have been determined in the interference, a showing of common subject matter must of necessity include a showing that Flier had support for the invention as claimed. As proponent of the rejection the PTO has the burden of showing that the use of undenatured soybean meal is inherent in the Flier application.

The board acknowledged that Flier does not contain an express disclosure of the use of an undenatured[5] soybean meal as a starting material in the claimed process. Similarly, the board acknowledged that Flier contains no express disclosure that denaturation occurs during the heating step of the disclosed process. It pointed out, however, that there is no reasonable basis from a reading of the Flier disclosure for presuming that Flier's soybean meal is not undenatured, particularly since there are no disclosed preprocessing operations on the soybean which might denature it.

We do not believe that this is enough to show inherency, particularly in view of appellant's evidence tending to negate any inherency. We first note an affidavit by Hale submitted during prosecution[6] of Flier's application in which it was stated that the Flier process embodied in his application was used to make Chuck Wagon[7] dog food. Another amendment[8] submitted during prosecution of the Flier application, stated that the red chunk of Chuck Wagon dog food was made by the Flier process. In separate litigation[9] involving the alleged infringement of Patent No. 3,047,395 by the method of making the red chunks in the Chuck Wagon product, the assignee of the Flier application represented to the court that the red chunks of the Chuck Wagon product were made from *denatured* soybean material. In a memorandum written by the court in that litigation reference is made to the use of denatured soybean meal in the process producing the red chunks in the Chuck Wagon product:

The Ralston [Flier] process starts with soybean meal which has been toasted and is almost complete denatured.

\* \* \* \* \* \*

5. The following definition of denature has been provided in the solicitor's brief and was taken from *Webster's Third New International Dictionary* (1961):

2: to so modify (a native protein) esp. by heat, acid, alkali or ultra-violet radiation that some of the original properties (as solubility and specific activity) no longer are present or present in the same degree owing to a change in molecular structure.

6. Submitted in an amendment filed April 10, 1968.

7. Registered trademark of Ralston Purina Company. Ralston Purina is also the assignee of the Flier application.

8. Submitted July 13, 1972.

9. *Ralston Purina Co. v. General Foods Corp.*, 375 F.Supp. 1023 (E.D.Mo.1969).

The toasting process consists of steaming, heating, flaking the beans, removing the oil and fat from them and then drying and grinding. This process has been used at Ralston since 1959. The toasting process results in almost completely denaturing the starting material.

That memorandum also details many of the process steps used to make the red chunks which correspond to the process steps disclosed in the Flier application. Although this evidence does not conclusively prove that the soybean meal utilized in the Flier application must be denatured, it is sufficient to indicate that the use of undenatured soybean meal in the Flier application is not the necessary and only reasonable construction to be given the Flier disclosure. *In re Filstrup*, 251 F.2d 850, 45 CCPA 783, 116 USPQ 440 (1958). The use of a preprocessing toasting procedure in which denaturation occurs is entirely consistent with the Flier disclosure. For the doctrine of inherency to apply it must be inevitable that Flier uses an undenatured soybean meal. *Pingree v. Hull*, 518 F.2d 624, 186 USPQ 248 (Cust. & Pat.App.1975).

Since the PTO has failed to show that the use of undenatured starting material is inherent in Flier, it has failed to demonstrate that the claimed subject matter is clearly common to both appellant's application and that of Flier.

In view of the fact that we have not found the subject matter of the appealed claims to be common to both applications, we have no need to consider appellant's arguments that interference estoppel should not apply because of his attempt to add the proposed count in the interference.

Accordingly, the decision of the board is *reversed*.

*REVERSED.*